**In re PW, LLC, Debtor.**

**Clear Channel Outdoor, Inc., Appellant,**

**v.**

**Nancy Knupfer, Chapter 11 Trustee; DB Burbank, LLC, Appellees.**

**BAP No. CC–07–1176–MkKuPa. Bankruptcy No. LA 06–16059 BB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 29, 2007.

Filed May 30, 2008.

Corrected July 18, 2008.*

---

* Minor clerical revisions have been made to this Opinion, originally issued on May 30, 2008, as reflected in the Clerk's Notice of

Minor Clerical Changes filed contemporaneously herewith.

Lewis R. Landau, Calabasas, CA, for Clear Channel Outdoor, Inc.

John N. Tedford IV, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, for Nancy Knupfer, Chapter 11 Trustee.

Joel G. Samuels, Sidley Austin, LLP, Los Angeles, CA, for DB Burbank, LLC.

Before: MARKELL, KURTZ ** and PAPPAS, Bankruptcy Judges.

## OPINION

MARKELL, Bankruptcy Judge.

This appeal presents a simple issue: outside a plan of reorganization, does § 363(f) of the Bankruptcy Code permit a secured creditor to credit bid its debt and purchase estate property, taking title free and clear of valid, nonconsenting junior liens? We hold that it does not.

In reaching this conclusion, we reject the contention that once the sale is consummated, the appeal from the order stripping the junior creditor's liens is moot and immune from scrutiny, and we hold that, in the circumstances of this case, the junior lienholder's rights are preserved.

The debtor in this case, PW, LLC ("PW"), owned prime real estate in Burbank, California. DB Burbank, LLC ("DB"), an affiliate of a large public hedge fund, held a claim of more than $40 million secured by PW's property. But problems large and small plagued PW's development plan. These problems ultimately led to

** Hon. Frank Kurtz, Chief Bankruptcy Judge for the Eastern District of Washington, sitting by designation.

PW's chapter 11 bankruptcy and to the appointment of Nancy Knupfer as PW's chapter 11 trustee ("Trustee").

DB, working with the Trustee, organized a campaign to consolidate all of PW's property and development rights and to sell this package, free and clear of all claims and encumbrances, at a sale supervised by the bankruptcy court.[1] At the sale, DB was the highest bidder, paying its consideration by credit-bidding the entire amount of its debt.

The only problem was the existence of a consensual lien securing a claim of approximately $2.5 million in favor of a junior creditor, Clear Channel Outdoor, Inc. ("Clear Channel"). Relying solely on § 363(f)(5), the bankruptcy court confirmed the sale to DB free and clear of Clear Channel's lien. The bankruptcy court then denied a stay of the sale pending appeal, as did our motions panel.

The first issue presented is whether the appeal is moot. We conclude that while any relief related to the transfer of title to DB is moot, stripping Clear Channel's lien and related state law rights present an issue that is discrete and separable from title transfer. That part of Clear Channel's appeal is not moot.

After reviewing applicable law, we conclude that § 363(f)(5) cannot support transfer of PW's property free and clear of Clear Channel's lien based on the existing record. We thus reverse that portion of the bankruptcy court's order authorizing the sale to DB free and clear of Clear Channel's lien, and we remand the matter to the bankruptcy court for further proceedings.

Finally, Clear Channel contends that a separate payment obligation from DB to the Trustee was subject to Clear Channel's lien, and that the bankruptcy court improperly stripped its lien rights in that payment obligation. We hold that the payment obligation was not subject to Clear Channel's lien, and we affirm on this point.

## I. FACTS

Before filing for bankruptcy, PW owned and was attempting to develop real property in Burbank, California. It had a development agreement with the City of Burbank ("Development Agreement") that provided entitlements for a mixed-use complex of luxury condominiums and retail space. In order to realize the value of the entitlements, however, PW had to acquire an assemblage of eighteen parcels of real estate by February 2009. When it filed bankruptcy, PW owned only fourteen of the necessary parcels. It had, however, entered into an agreement to acquire the final four parcels, which were occupied by a church ("Church Property"). Closing this agreement and the final purchase of the Church Property was conditioned on

---

1. The working partnership extended to the briefs in this matter, as the appellees divided the issues between them. Even with this understanding, however, the briefs violated the length rules found in 9TH CIR. BAP RULES 8010(a)–1 & 8010(c)–1. The panel discussed its concerns with counsel for the parties at oral argument, and we feel compelled to again highlight those rule violations here. For example, Clear Channel attached extraneous materials to its brief apparently in an effort to include more substance than the 30-page limitation would allow. DB's and the Trustee's coordinated briefs contain even more transparent efforts to evade the page limit. DB's brief, for example, used significantly reduced margins, improperly small font sizes, and inappropriate line spacing, and contained excessive, single-spaced footnotes. Under the circumstances, it is difficult for the panel to conclude that these tactics were unintentional. In our view, this approach to advocacy is inappropriate and unfair. Counsel should avoid future attempts to evade court rules.

the church's finding another suitable location for its activities.

DB held a first-priority lien on substantially all of PW's assets. It began foreclosure proceedings in July 2006 and sought the appointment of a state court receiver. After the receiver was appointed, DB lent the receiver more money to buy additional parcels.

During this time, DB and PW tried to negotiate a chapter 11 plan. They had not reached an agreement when, on November 20, 2006, on the eve of a scheduled foreclosure sale, PW filed a chapter 11 case. DB immediately moved for, and the bankruptcy court granted, the appointment of a trustee, which was done on December 27. The receiver turned over all of PW's assets to the Trustee in January 2007.

The Trustee faced several immediate problems. These included obtaining and paying the cure amounts related to the contract to acquire the Church Property, and otherwise implementing the terms of the Development Agreement. In addition, as a "single asset real estate" case, *see* 11 U.S.C. § 101(51B), it was likely that DB would be granted relief from stay under § 362(d)(3).[2]

In response, the Trustee proposed to sell PW's property and began discussions with DB to that end. With bankruptcy court authorization, the Trustee hired a real estate broker to market PW's property to others. In addition, to facilitate acquisition of the Church Property, the broker agreed to help the Trustee find a new location for the church.[3]

After negotiation, the Trustee and DB entered into an agreement they called a "Binding Term Sheet," which established detailed sale procedures for an auction and sale of PW's assets. Under its terms, the Trustee gained time to market and sell PW's property and to resolve disputes that had arisen regarding the Church Property.

The Binding Term Sheet also provided that DB would serve as a stalking horse bidder for a sale of PW's property. If there were no qualified overbidders, DB would buy PW's property for $41,434,465, which the parties called the "Strike Price."[4] In addition, DB agreed to pay the Trustee a "Carve–Out Amount" of up to $800,000 for certain administrative fees and other expenses.[5] DB also agreed not to seek relief from the automatic stay and to refrain from communicating with third parties regarding the sale of PW's assets.

On March 20, 2007, the bankruptcy court entered an order establishing a pro-

---

**2.** Section 362(d)(3) provides in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—...

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief ... or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of

being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments....

**3.** The broker was not entitled to a commission if DB, PW, or an affiliate of either acquired PW's property.

**4.** The Strike Price equaled the amount due to DB plus a senior lien, less the negotiated minimum overbid amount.

**5.** The Carve–Out Amount was to be reduced to $550,000 if DB paid the receiver's final fees.

cedure for the sale of PW's property. Two days later, the Trustee moved to approve the sale free and clear of liens under § 363(f)(3) and (f)(5).

Clear Channel opposed the motion, asserting that § 363(f) was not applicable. Over Clear Channel's objection, on April 26, 2007, the bankruptcy court entered a separate order authorizing the sale free and clear of Clear Channel's lien under § 363(f)(5) ("Sale Order").

The March 20 order set May 7 as the deadline for submitting written bids, and the same order set the minimum overbid at $43,618,048, plus whatever amount was necessary to cure defaults related to acquiring the Church Property. Only three bids were timely received, and none qualified. The highest was a nonconforming contingent bid of only $25.25 million.

With no qualified overbidders, the Binding Term Sheet required the Trustee to sell PW's property to DB at the Strike Price, DB to pay the Trustee the Carve–Out Amount, and DB to pay certain administrative fees, including the receiver's fees and other expenses.

On May 31, 2007, the bankruptcy court confirmed the sale to DB and found that DB was a purchaser in good faith. The court entered an order to this effect ("Confirmation Order"), and declined to stay that order pending appeal, as did a prior motions panel of this court.

The sale closed on June 15, 2007. Clear Channel received no payment under the terms of the sale because DB's credit bid meant that there were no proceeds to which Clear Channel's lien could attach. Since closing, DB has paid out more than

$1.5 million, including $250,000 in final payment to the receiver for fees and expenses, $550,000 to the estate as the remaining Carve–Out Amount, $750,000 to a senior lienholder, and other amounts necessary to pay outstanding real estate taxes and other costs of closing. For her part, the Trustee has made payments out of the Carve–Out Amount to herself and her professionals on an interim basis.

Clear Channel filed a timely appeal on May 1, 2007, and seeks reversal of both the Sale Order and the Confirmation Order. Clear Channel also asserts that its lien extends to the Carve–Out Amount and seeks reversal of the bankruptcy court's order that it does not.[6]

## II. STANDARDS OF REVIEW

■ "We review the bankruptcy court's conclusions of law and questions of statutory interpretation de novo, and factual findings for clear error." *Village Nurseries v. Gould (In re Baldwin Builders)*, 232 B.R. 406, 410 (9th Cir. BAP 1999) (citations omitted). *See also Ritter Ranch Dev., L.L.C., v. City of Palmdale (In re Ritter Ranch Dev., L.L.C.)*, 255 B.R. 760, 763 (9th Cir. BAP 2000).

■ In addition, we review orders to sell property under 11 U.S.C. § 363(b) and (f) for an abuse of discretion. *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 265 (9th Cir. BAP 2005). We find an abuse of discretion if we have a definite and firm conviction that the bankruptcy court committed a clear error of judgment, *Mendez v. Salven (In re Mendez)*, 367 B.R. 109, 113 (9th Cir. BAP 2007), or if the court incorrectly interpreted the law. *In re Popp*, 323 B.R. at 265; *United States v.*

---

**6.** After the sale closed, DB and the Trustee moved to dismiss this appeal as moot. On September 11, 2007, a motions panel granted DB's motion as to the sale, citing § 363(m). But that motions panel left it to this merits panel to determine whether stripping Clear Channel's lien under § 363(f) was moot and whether Clear Channel was entitled to any portion of the Carve–Out Amount.

*Sprague*, 135 F.3d 1301, 1304 (9th Cir. 1998).

## III. DISCUSSION

Before reaching the merits of Clear Channel's appeal, we must first determine whether it is moot. That determination requires us to examine what it means for an appeal from a sale order to be moot.

### A. *Mootness*

In bankruptcy, mootness comes in a variety of flavors: constitutional, equitable, and statutory.

### 1. *Constitutional Mootness*

■■■ Constitutional mootness derives from constitutional limitations on the federal court to adjudicate only actual cases and live controversies. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *In re Popp*, 323 B.R. at 270–271 (citing *Luckie v. EPA*, 752 F.2d 454, 457 (9th Cir.1985)). A live case or controversy exists only if the parties have an interest in the outcome of the litigation. *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 466 U.S. 435, 442, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). But that interest in the outcome of the case dissolves, and an appeal is constitutionally moot, only if it is impossible to grant relief. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992).

■■■ Here, although the sale has been completed, there is still a live case or controversy because it is still possible to fashion some relief. The sale under both § 363(b) and § 363(f) may be reversed in full, or the sale itself under § 363(b) could be preserved while stripping liens under § 363(f) could be reversed. Such relief might be difficult or inequitable, but it is not impossible. Therefore, the appeal is not constitutionally moot.

### 2. *Equitable Mootness*

■■■ Equitable mootness requires the court to look beyond impossibility of a remedy to "the consequences of the remedy and the number of third parties who have changed their position in reliance on the order that is being appealed."[7] *In re Popp*, 323 B.R. at 271. As we further stated in *Popp*, "[c]ourts have applied the doctrine of equitable mootness when the appellant has failed to obtain a stay and [although relief is possible] the ensuing transactions are too 'complex and difficult to unwind.'" *Id.* at 271 (citations omitted). "Ultimately, the decision whether to unscramble the eggs turns on what is practical and equitable." *Baker & Drake, Inc. v. Pub. Serv. Comm'n (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1352 (9th Cir. 1994).

■■■ The changes that have taken place in connection with and since the closing of the sale are numerous and complex, which calls into question whether this appeal is equitably moot. Title to PW's property has been transferred to DB, and the Trustee has relinquished control over the development of PW's property to DB. DB has

---

7. Another form of equitable mootness, not present on the record here because of Clear Channels efforts to obtain a stay, exists when " 'appellants have failed and neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court,' thus 'permitting such a comprehensive change of circumstances to occur as to render it inequitable to consider the merits of the appeal.' " *Focus Media, Inc. v. Nat'l Broad. Co., Inc. (In re Focus Media, Inc.)*, 378 F.3d 916, 923 (9th Cir.2004) (quoting *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 798 (9th Cir. 1981)).

assumed the executory contracts and unexpired leases. DB has also executed and recorded a number of documents necessary to effectuate the sale. All of these have required significant expenditures.

As the Ninth Circuit recently noted:

"Bankruptcy's mootness rule 'developed from the general rule that the occurrence of events which prevent an appellate court from granting effective relief renders an appeal moot, and the particular need for finality in orders regarding stays in bankruptcy.'" ... The policy behind mootness is "to protect the interest of a good faith purchaser ... of the property."

*Suter v. Goedert,* 504 F.3d 982, 986 (9th Cir.2007) (quoting *Onouli–Kona Land Co. v. Estate of Richards (In re Onouli–Kona Land Co.),* 846 F.2d 1170, 1172 (9th Cir. 1988)).

Although the sale of the property was to a party to this appeal, there have been many subsequent actions that were relied on by third parties that are not party to this appeal. Although DB was aware of the risks of going forward with the sale, third parties were not and have since acted in reliance on the bankruptcy court's orders.

Under equitable mootness, when a trustee has already sold assets, "a court may be powerless to 'undo what has already been done.'" *Focus Media,* 378 F.3d at 922–23 (citation omitted). Here, even though all parties to the sale are present before this panel, complexities that cannot be easily undone arise with respect to the sale. These complexities and the impact

on third parties make review of the sale (but only the sale) to DB equitably moot.

But the same cannot be said about reinstating Clear Channel's liens. An appeal is not equitably moot as to lien-stripping under § 363(f) if reversing the lien-stripping raises neither the issue of complexity nor the issue of negative impact on third parties. That is the case here, and we hold that the lien-stripping aspect of the Sale Order is not equitably moot. *See In re Popp,* 323 B.R. at 271–72.

As an initial matter, reattaching Clear Channel's lien to PW's former property is not theoretically or practically difficult. Both parties are before the court, and no third-party action is required to reestablish Clear Channel's position. Moreover, DB has not identified any third party who would be prejudiced because it relied on the bankruptcy court's orders. *See Suter,* 504 F.3d at 986 (party asserting mootness has heavy burden to establish a lack of effective relief); *Focus Media,* 378 F.3d at 923 (same). As a result, while the appeal related to the sale itself may be equitably moot, the panel could reverse the transfer of Clear Channel's lien to the nonexistent sale proceeds and hold that it remains attached to property transferred to DB. *In re Popp,* 323 B.R. at 272. *See also Beneficial Cal. Inc. v. Villar (In re Villar),* 317 B.R. 88 (9th Cir. BAP 2004) (finding avoidance of lien was ineffective as to property that may have been sold even though third-party buyer was not a party to the appeal).[8]

By similar reasoning, our motions panel segregated the sale portion of the Sale Order from the lien-stripping portion of

---

**8.** Courts have also recognized that when the substantive error on appeal is alleged to be one of the misapplication of a statute to the derogation of a creditor's nonbankruptcy property rights, or in derogation of an estate professional's fiduciary duties, the practical effects of a reversal are of somewhat lesser importance in the calculation of equitable mootness. *See, e.g., Focus Media,* 378 F.3d at 923–24; *Elder v. Uecker (In re Elder),* 325 B.R. 292, 296–98 (N.D.Cal.2005).

the order. Given the relative ease with which Clear Channel can receive the relief it requests (if it is entitled to that relief), and the relative lack of prejudice to anyone other than the parties to this appeal, we hold that Clear Channel's appeal of the stripping of its lien is not equitably moot.

### 3. *Statutory Mootness Under § 363(m)*

Sales of property of the estate under § 363(b) and (c) are protected by § 363(m), which states:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

Section 363(m) is a codification of some aspects of equitable mootness with respect to sales. Unlike equitable mootness, however, § 363(m) provides for specific procedures and findings in order to provide certainty for sales.

DB contends that this section deprives this court of the ability to affect the sale. It argues that Clear Channel did not obtain a stay pending appeal, and the bankruptcy court made findings that DB acted in good faith. These facts reinforce our decision not to tamper with transfer of title to DB. The appeal for that part of the transaction is equitably moot, as we noted above, and the facts establish that it is also protected by § 363(m).

But the Confirmation Order authorized both a sale of PW's property and lien-stripping. While the lack of a stay and a transfer of the property would be relevant to whether § 363(m) applies to a sale authorized by § 363(b), these facts continue to be relevant only if § 363(m) applies to lien-stripping authorizations under § 363(f). We do not consider these facts, however, because we conclude that § 363(m) does not apply to lien-stripping under § 363(f).

First, § 363(m) by its terms applies only to "an authorization under subsection (b) or (c) of this section. . . ." Here, the remaining challenge is to the authorization under subsection (f) to sell the property free of Clear Channel's lien. Section 363(m) thus cleaves a distinction between authorizations to "use, sell or lease . . . property of the estate" as set forth in § 363(b) and authorizations under § 363(f) to "sell property under subsection (b) or (c) of this section free and clear of any interest in such property. . . ." Section 363(m) thus protects the court's authorization of a sale, in this case, out of the ordinary course of business, again making a distinction between the authorization of a sale and the terms under which the sale is to be made.

Second, the subsection limits only the ability to "affect the validity of a sale or lease under such authorization. . . ." Here, the telling locution is the limitation of § 363(m) to "sale[s] or lease[s]" authorized under § 363(b) or (c). Omitted is the "use" prong of authorization. As a result, a plain-language reading of the section would not give § 363(m) protection to an out-of-the-ordinary-course use approved by a bankruptcy court. *See* Part III.B.1., *infra*.

This limitation leads us to conclude that Congress intended that § 363(m) address only changes of title or other essential attributes of a sale, together with the changes of authorized possession that occur with leases. The terms of those sales,

including the "free and clear" term at issue here, are not protected.

Indeed, Congress could easily have broadened the protection of § 363(m) to include lien-stripping. As an example, it could have stated that all "transfers" were to be protected, as that term is broadly defined in § 101(54). It did not. Instead, it restricted the protection of § 363(m) to sales and leases.[9]

That § 363(m) is so limited can also be seen by comparing the language chosen—sales or leases—with Congress's efforts to protect liens and security interests granted by the estate in § 364. Section 364 permits the estate to grant liens and security interests similar to those sought to be stripped here. To protect lenders' reliance of on such grants, Congress added § 364(e) to the Code. It states:

> (e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

In § 364(e), Congress chose words specific to the task—"debt," "lien," and "priority." That these types of words are absent from § 363(m) underscores congressional intent not to insulate and immunize lien-stripping actions from appellate review.

Not surprisingly, DB argues that its agreement to purchase the property was conditioned on receiving a free and clear title. For that reason, the Confirmation Order contained language both of sale and of lien-stripping. In DB's view, the sale language cannot be separated from the lien-stripping language because both sale and lien-stripping were integral to its decision to purchase the property. *See, e.g., Official Committee of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.),* 328 F.3d 1003, 1007 (8th Cir.2003). In short, DB contends that authorization for the sale also authorized the lien-stripping, and that one cannot be affected without necessarily affecting the other.

In response, we observe that in choosing the words it did in § 363(m), Congress did not intend the two types of actions to receive the same level of protection. That is, divesting the estate of property and vesting it in another is treated differently from stripping a lien. Put another way, stripping a lien is not a sale or a lease protected by the language of § 363(m), either directly or indirectly.

A more nuanced response is that a sophisticated lender such as DB knew of the risks inherent in relying solely on § 363(f)(5) to strip Clear Channel's lien. It could not have avoided these risks by, for example, insisting that the Confirmation Order contain an explicit contractual condition that there be no appellate review. That would have been rejected out of hand, as any other express condition that similarly violated law or public policy would have been. But a party ought not be able to do indirectly what it cannot do directly, and we are reluctant to interpret § 363(m) to give DB indirectly a review-free stripping of Clear Channel's nonbankruptcy property rights. DB cannot mask an improper condition of the transfer—avoiding appellate review—by cloaking it

---

**9.** As we point out later, the type of lien-stripping that PW and DB engaged in is specifically authorized in chapter 12 cases, and the relevant statute there does not contain any provisions similar to § 363(m). *See* 11 U.S.C. § 1206.

as an essential and inseparable part of a sale.

The response to this argument is that all that the Code and Rules provide for creditors such as Clear Channel is the ability to seek a stay pending appeal. But in these circumstances, when a bond staying the consummation of the deal would have been far in excess of the lien that Clear Channel is trying to protect, we question whether that remedy is exclusive.

In short, DB knew or should have known all along that lien-stripping might not work. So its assertion that the sale was inseparable from the lien-stripping rings hollow, as does its argument that a stay was required to avoid mootness. *See Suter,* 504 F.3d at 990 (failure to obtain stay not always fatal to mootness defense). We conclude that, on these facts, lien-stripping under § 363(f)(5) is not protected under § 363(m).[10]

### B. Statutory Interpretation of § 363(f)

Our holding that the appeal is not moot requires us to consider whether § 363(f) permits the stripping of Clear Channel's lien. Sales free and clear of interests are authorized under § 363(f). That subsection provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Of the five paragraphs that authorize a sale free and clear, three do not apply to this appeal. Paragraph (1) does not apply because applicable law—California real property law—does not permit a sale free and clear, and indeed would preserve Clear Channel's lien despite the transfer. *Nguyen v. Calhoun,* 105 Cal.App.4th 428, 438, 129 Cal.Rptr.2d 436, 445 (Cal.Ct.App. 2003) ("Real property is transferable even though the title is subject to a mortgage or deed of trust, but the transfer will not eliminate the existence of that encumbrance. Thus, the grantee takes title to the property subject to all deeds of trust and other encumbrances, whether or not the deed so provides.") (citations omitted). Paragraph (2) is inapplicable as Clear Channel did not consent to the transfer free of its interest. Paragraph (4) applies only if the interest is in bona fide dispute, and no one disputes the validity of Clear Channel's lien. As a result, we need only analyze the bankruptcy court's ability to authorize a sale free and clear of Clear Channel's lien under paragraphs (3) and (5).

#### 1. *Guidance on Interpretation*

We first review case law on statutory interpretation because paragraphs (3) and

---

**10.** Indeed, one commentator has decried the lack of doctrinal consistency in the § 363(f) area and has indicated that inconsistent and insufficiently justified applications of the mootness doctrine have been one cause.

George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process,* 76 AM. BANKR.L.J. 235, 244 & n. 32 (2002).

(5) of § 363(f) present legitimate and difficult questions of statutory interpretation. Paragraph (3), for example, uses a non-standard term to refer to the claims held by creditors secured by the property being sold. It refers to the "aggregate value of all liens" on the property. The Code, however, tends to refer not to the economic value of the property secured by liens but to the value of claims secured by those liens. *See, e.g.,* 11 U.S.C. §§ 506(a); 1129(b)(2). If § 363(f)(3) had been worded to refer to the "aggregate value of all claims secured by liens on such property," it would have been in the mainstream of other provisions of the Code, and no real question would be presented. But it was not. This variant locution requires us to decide whether the unusual construction should be given special interpretive significance.

Paragraph (5) presents an even greater conundrum: the competing constructions seem either to render it so specialized as never to be invoked, or all-powerful, subsuming all the other paragraphs of § 363(f). Before launching into the task of interpreting these two paragraphs, ·we should first review applicable rules of construction for federal statutes. *See* Thomas F. Waldron & Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective after Two Years of BAPCPA,* 81 AM. BANKR. L.J. 195, 202–11 (2007).

■ When construing any federal statute, the presumption is that the accepted and plain meaning of the words used reflects the sense in which Congress used them. As the Supreme Court has stated:

The starting point in discerning congressional intent is the existing statutory text ... and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."

*Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004), quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (in turn quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

■ But there is more. Because the words of a statute are meant to be law, the legal background of the words used, as well as a lawyer's understanding of them, are also important. Part of the background relevant to this appeal is Congress's promulgation of federal bankruptcy law as a separate title of the United States Code. This separate title is organized as a cohesive code. For example, it groups similar topics together through the use of chapters, and it uses common, defined terms throughout. *See* 11 U.S.C. § 101. To aid in consistent application, the Code's terms are sometimes defined in ways that vary from standard English. A "custodian," for example, is not a janitor or building superintendent, but rather a receiver or trustee for the debtor's property. *See* 11 U.S.C. § 101(11).[11]

■ Further, the Supreme Court has acknowledged that even undefined words and phrases in the Bankruptcy Code should presumptively receive the same construction, even if found in different parts of the code. *See Rousey v. Jacoway,* 544 U.S. 320, 326–27, 125 S.Ct. 1561, 161 L.Ed.2d 563 (2005) (looking at use of "on

---

**11.** This type of variance is not restricted to the Bankruptcy Code. In the Uniform Commercial Code, "afternoon" can mean one minute before midnight. *See* UCC § 4–104(a)(2) ("afternoon" is any time between noon and midnight).

account of" in provisions of the Bankruptcy Code other than the one at issue). *See also Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Am. Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir.2005) ("Our goal in interpreting a statute is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a ... harmonious whole.'") (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)).[12]

That brings us to § 363(f), and its proper interpretation.

### 2. *Paragraph (3) and Sales for Less than the Amount of All Claims Secured by the Property*

 PW's property sold for less than the amount of claims secured by PW's property. DB and the Trustee contend that § 363(f)(3) authorizes the sale free and clear of the liens in this situation.[13] The bankruptcy court found, and we agree, that § 363(f)(3) cannot be so used.

The actual text of paragraph (3) permits a sale free and clear of an interest only if:

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; . . . .

The Trustee asserts that the "aggregate value of all liens" in this paragraph means the economic value of such liens, rather than their face value. This argument arises from § 363(f)(3)'s variance from general Code usage; that is, whether its reference to "value of all liens" is simply an unfortunate deviation from the Code's general preference to refer to claims, and not liens, or whether it has some other significance.

The Trustee and DB assert that, under conventional bankruptcy wisdom, supported by § 506(a), the amount of an allowed secured claim can never exceed the value of the property securing the claim.[14]

---

12. Even those who seek a strict reading of statutes embrace this contextual approach. As a leading proponent of the textualist school, Professor John Manning at Harvard Law School, states: "textualists further acknowledge that '[i]n textual interpretation, context is everything.'" John F. Manning, *What Divides Textualists From Purposivists?*, 106 Colum. L.Rev. 70, 79–80 (2006) (footnotes omitted) (quoting Antonin Scalia, *Common-Law Courts in a Civil Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, in A Matter of Interpretation: Federal Courts and the Law 37 (1997)). Put another way, "modern textualists urge judges to focus on what they consider the more realistic—and objective—measure of how 'a skilled, objectively-reasonable user of words' would have understood the statutory text in context." Manning, *supra*, 106 Colum. L.Rev. at 75 (quoting Frank H. Easterbrook, *The Role of Original Intent in Statutory*

*Construction*, 11 Harv. J.L. & Pub. Pol'y 59, 65 (1988)).

13. Although DB has not appealed the decision excluding § 363(f)(3) as a basis for selling PW's property free and clear of Clear Channel's lien, it does assert that § 363(f)(3) supports the bankruptcy court's decision. Under the rule that we may affirm a decision on any basis found in the record, *Cal. Self-Insurers' Sec. Fund v. Lorber Indus. of Cal. (In re Lorber Indus. of Cal.)*, 373 B.R. 663, 670 (9th Cir. BAP 2007), we consider DB's arguments in this regard.

14. This statement would not be true if a creditor could and did make the § 1111(b) election to have its allowed secured claim equal its total claim amount, 11 U.S.C. § 1111(b), or, in a chapter 13 case, if the hanging paragraph of § 1325 applied, 11 U.S.C. § 1325(a).

Since a secured claim is a form of "lien," *see* 11 U.S.C. § 101(37), some courts have found that an estate representative may use § 363(f)(3) to sell free and clear of the property rights of junior lienholders whose nonbankruptcy liens are not supported by the collateral's value. That is, there may be a sale free and clear of "out-of-the-money" liens. *See, e.g., In re Beker Indus. Corp.*, 63 B.R. 474, 476–77 (Bankr.S.D.N.Y. 1986); *In re Terrace Gardens Park P'ship*, 96 B.R. 707 (Bankr.W.D.Tex.1989); *In re Oneida Lake Dev., Inc.*, 114 B.R. 352 (Bankr.N.D.N.Y.1990); *In re WPRV–TV, Inc.*, 143 B.R. 315, 320 (D.P.R.1991); *Milford Group, Inc. v. Concrete Step Units, Inc. (In re Milford Group, Inc.)*, 150 B.R. 904, 906 (Bankr.M.D.Pa.1992); *In re Collins*, 180 B.R. 447, 450–51 (Bankr.E.D.Va. 1995).

We disagree. This reading expands § 363(f)(3) too far. It would essentially mean that an estate representative could sell estate property free and clear of any lien, regardless of whether the lienholder held an allowed secured claim. We think the context of paragraph (3) is inconsistent with this reading. If Congress had intended such a broad construction, it would have worded the paragraph very differently.[15] *See Ron Pair Enters.*, 489 U.S. at 242 n. 5, 109 S.Ct. 1026 (Congress knows distinction between types of liens, and language of the Bankruptcy Code should be interpreted in a way that acknowledges that knowledge). For this reason, many courts and commentators have rejected this approach. *See, e.g., Richardson v. Pitt County (In re Stroud Wholesale, Inc.)*, 47 B.R. 999, 1002 (E.D.N.C.1985), *aff'd mem.*, 983 F.2d 1057

(4th Cir.1986); *Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821 (N.D.Ill.1993); *In re Perroncello*, 170 B.R. 189 (Bankr. D.Mass.1994); *In re Feinstein Family P'ship*, 247 B.R. 502 (Bankr.M.D.Fla.2000); *In re Canonigo*, 276 B.R. 257 (Bankr. N.D.Cal.2002); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527 (D.N.J.2003); *see also In re Healthco Int'l, Inc.*, 174 B.R. 174 (Bankr.D.Mass.1994); 3 Collier on Bankruptcy ¶ 363.06[4][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2008).[16]

But another reason, rooted in the text of the paragraph, exists to reject such an expansive reading. Paragraph (3) permits the sale free and clear only when "the price at which such property is to be sold *is greater than* the aggregate value of all liens...." 11 U.S.C. § 363(f)(3) (emphasis added). If, as DB and the Trustee assert, "aggregate value of all liens" means the aggregate amount of all allowed secured claims as used in § 506(a), then the paragraph could *never* be used to authorize a sale free and clear in circumstances like those present here; that is, when the claims exceed the value of the collateral that secures them. In any case in which the value of the property being sold is less than the total amount of claims held by secured creditors, the total of all allowed secured claims will *equal*, not exceed, the sales price, and the statute requires the price to be "greater than" the "value of all liens." *See, e.g., In re Gen. Bearing Corp.*, 136 B.R. 361, 366 (Bankr.S.D.N.Y.1992).

---

15. Or it would have worded it as it worded § 1206. *See* Part III.B.3.b. *infra*.

16. We also draw some interpretive comfort from Congress's 1984 amendment to § 363(f)(3). As noted in *Stroud Wholesale*, in 1984 Congress amended § 363(f)(3) to substitute "all liens on such property" for "such

interest," which made "clear Congress' intention that sales free and clear of liens and interests may be justified by (f)(3) only if the sale price will exceed the aggregate value of all liens on the property." 47 B.R. at 1001–02.

As a result, we join those courts cited above that hold that § 363(f)(3) does not authorize the sale free and clear of a lienholder's interest if the price of the estate property is equal to or less than the aggregate amount of all claims held by creditors who hold a lien or security interest in the property being sold.

### 3. *Paragraph (5) and Sales for Less Than the Lienholder's Claim*

The parties' main dispute lies over the proper application of § 363(f)(5). The bankruptcy court, supported by the Trustee and DB, found that the plain meaning of that paragraph permitted a sale free and clear of Clear Channel's lien. On appeal, Clear Channel argues that the paragraph's plain meaning does not support the bankruptcy court's construction. Clear Channel has the best of this argument. We thus reverse on this point. Because the meaning of paragraph (5) is anything but plain, we must carefully consider the statute's wording and the competing interpretations.

We start with the text of the statute. Section 363(f)(5) permits an estate representative, such as the Trustee, to sell free of an entity's interest in estate property if:

> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

We parse this paragraph to contain at least three elements: that (1) a proceeding exists or could be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its interest.

Courts are divided over the interpretation of each of these elements. We analyze these components in reverse order. We start first with an analysis of what Congress meant by an "interest," then move to the proper construction of a money satisfaction, and conclude with an examination of appropriate legal and equitable proceedings.

#### a. Lien as Interest

■ Clear Channel's primary contention is that the term "interest" must be read narrowly to exclude liens such as the one it holds. So read, § 363(f)(5) would be inapplicable, as a matter of law, to authorize the sale free and clear of Clear Channel's lien. *See, e.g., In re Canonigo,* 276 B.R. at 266. Clear Channel asserts that to do otherwise renders the other subsections under § 363(f) mere surplusage.

We reject Clear Channel's argument. We believe that Congress intended "interest" to have an expansive scope, as shown by *United States v. Knox–Schillinger (In re Trans World Airlines, Inc.),* 322 F.3d 283 (3d Cir.2003). In *TWA,* the Third Circuit held that there were two "interests" subject to § 363(f)(5): 1) travel vouchers issued in connection with settlement of a discrimination action and 2) discrimination claims made by the EEOC. The court reasoned that, if the debtor-airline had liquidated its assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts, and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims. Similarly, the EEOC discrimination claims were reducible to, and could have been satisfied by, monetary awards even if injunctive relief was sought. *Id.* at 290–91. *See also P.K.R. Convalescent Ctrs., Inc. v. Virginia (In re P.K.R. Convalescent Ctrs., Inc.),* 189 B.R. 90, 94 (Bankr.E.D.Va.1995) (statutory right to recapture depreciation on sale of health facility an interest within meaning of § 363(f)(5)). *See also* Kuney, 76 Am. Bankr. L.J. at 257 (lien is a subset of interests).

Some cases, however, have adopted a restricted construction of "interest" in order to prevent needless overlap. In particular, cases such as *In re Canonigo* reason that the term "interest" must be read differently in (f)(5) from every other use of the term in § 363(f). *In re Canonigo*, 276 B.R. at 265.

But the distinctions drawn by *Canonigo* are not supported by the plain reading we are required to give to the statute. It is telling that the introductory sentence to § 363(f) broadly refers to "any interest," and that four of the following paragraphs then refer back to "such interest." Within this group is § 363(f)(3), which explicitly states that it applies only if "such interest is a lien," making it apparent that Congress intended a lien to be a type of interest. Congress would not have used the language it did in paragraph (f)(3), or at least would have included additional language in paragraph (5), if it had intended to exclude liens from paragraph (f)(5).

In addition, though the Code does not define "interest," [17] it does define "lien." Clear Channel's reading contradicts that definition in which lien "means charge against or *interest* in property." 11 U.S.C. § 101(37) (emphasis added). The definition of lien provides another inference consistent with the interpretation that a lien is but one type of interest. Clear Channel asserts that *Canonigo's* interpretation promotes the statutory purpose of avoiding the use of § 363(f) as a means of escaping the rigors of the chapter 11 plan confirma-

tion process. Daniel J. Carragher, *Sales Free and Clear: Limits on § 363(f) Sales*, AM. BANKR.INST. L.J., at 16 (July/August 2007).[18]

Consistent with the plain reading of § 363(f) generally, and § 363(f)(5) in particular, we construe "interest" to include the type of lien at issue in this appeal.

### b. Compelling Money Satisfaction

■ Clear Channel's alternative position is that if § 363(f)(5) does apply to authorize a sale free and clear of liens, then the bankruptcy court erred in holding that Clear Channel "could be compelled ... to accept a money satisfaction" of its interest.

#### i. *Compelling Satisfaction for Less Than Full Payment*

The bankruptcy court found paragraph(f)(5) applicable whenever a claim or interest can be paid with money.[19] We do not think that § 363(f)(5) is so simply analyzed. Although it is tautological that liens securing payment obligations can be satisfied by paying the money owed,[20] it does not necessarily follow that such liens can be satisfied by paying *any* sum, however large or small. We assume that paragraph (5) refers to a legal and equitable proceeding in which the nondebtor could be compelled to take *less* than the value of the claim secured by the interest. *See In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 508 (Bankr.N.D.Ala.2002).

---

**17.** Congress did refer to equity positions in partnerships as "interests," 11 U.S.C. § 101(16)(B), and did define a "security interest" as a lien created by agreement. *Id.* § 101(51).

**18.** Some courts have reconciled the differences by simply stating that "[l]iens are addressed directly in § 363(f)(3) and it is that section which is to be applied." *Beker*, 63 B.R. at 478.

**19.** The bankruptcy court stated at the hearing, "The question is, is it the kind of an interest that could be satisfied with money, and if so, then, you can sell free and clear." Hr'g. Tr. 99:1–3 (April 5, 2007).

**20.** If the lien secured the faithful performance of a nonmonetary obligation, the generalization would not apply.

Other courts agree and hold that it is not the type of interest that matters, but whether monetary satisfaction may be compelled for less than full payment of the debt related to, or secured by, that interest. *In re Terrace Chalet Apts.*, 159 B.R. at 829 ("By its express terms, Section 363(f)(5) permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt."); *In re Stroud Wholesale, Inc.*, 47 B.R. at 1002; *WBQ P'ship v. Virginia Dep't of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 107 (Bankr.E.D.Va.1995). If full payment were required, § 363(f)(5) would merely mirror § 363(f)(3) and render it superfluous. *In re Terrace Chalet Apts.*, 159 B.R. at 829.

Under the view that full payment is not necessary, it is not the amount of the payment that is at issue, but whether a "mechanism exists to address extinguishing the lien or interest without paying such interest in full." *In re Gulf States Steel*, 285 B.R. at 508. Other courts have required a showing of the basis that could be used to compel acceptance of less than full monetary satisfaction. *See, e.g., id.; In re Terrace Chalet Apts.*, 159 B.R. at 829.

Although this view leads to a relatively small role for paragraph (5), we are not effectively writing it out of the Code. Paragraph (5) remains one of five different justifications for selling free and clear of interests, and its scope need not be expansive or all-encompassing. So long as its breadth complements the other four paragraphs consistent with congressional in-

tent, without overlap, our narrow view is justified.

Examples can be formulated that demonstrate this complementary aspect of a narrow view of paragraph (5).[21] One might be a buy-out arrangement among partners, in which the controlling partnership agreement provides for a valuation procedure that yields something less than market value of the interest being bought out. *See, e.g., De Anza Enters. v. Johnson*, 104 Cal.App.4th 1307, 128 Cal.Rptr.2d 749 (2002) (joint venturer may compel specific performance of buyout of other venturer's interest pursuant to joint venture agreement); *Oliker v. Gershunoff*, 195 Cal. App.3d 1288, 241 Cal.Rptr. 415 (1987) (statute provided that partnership could compel buyout of withdrawing partner for a fair price to be determined by several factors). Another might be a case in which specific performance might normally be granted, but the presence of a liquidated-damages clause allows a court to satisfy the claim of a nonbreaching party in cash instead of a forced transfer of property. *See, e.g., O'Shield v. Lakeside Bank*, 335 Ill.App.3d 834, 269 Ill.Dec. 924, 781 N.E.2d 1114 (2002). Yet another might be satisfaction of obligations related to a conveyance of real estate that normally would be specifically performed but for which the parties have agreed to a damage remedy. *S. Motor Co. v. Carter–Pritchett–Hodges, Inc. (In re MMH Automotive Group, LLC)*, 385 B.R. 347 (Bankr. S.D.Fla.2008). In these cases, a court could arguably compel the holders of the interest to take less than what their inter-

---

**21.** *Collier* seems to indicate that UCC § 9–320, which permits a sale free and clear of a consensual security interest if the collateral is sold in the ordinary course of business of the debtor, might satisfy paragraph (5). 3 COLLIER ON BANKRUPTCY, *supra*, ¶ 363.06[6][a]. We

think, however, that such a use is better classified under paragraph (1). Somewhat paradoxically, *Collier* also indicates that UCC § 9–320 satisfies the requirements of paragraph (1). 3 COLLIER ON BANKRUPTCY, *supra*, ¶ 363.06[2].

est is worth.[22]

#### ii. *Construction Consistent with §§ 363(f)(3) and 1206*

■ While the bankruptcy court's reading is plausible if paragraph (5) is read in isolation, statutory interpretation requires a more detailed examination of the context of the statute. *See, e.g., Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Put another way, any interpretation of paragraph (5) must satisfy the requirement that the various paragraphs of subsection (f) work harmoniously and with little overlap. The bankruptcy court's broad interpretation does not do this.

Initially, if the Trustee's and DB's interpretation were accepted, paragraph (5) would swallow and render superfluous paragraph (3), a provision directed specifically at liens. The specific provisions of paragraph (3) would never need to be used, since all liens would be covered, re-gardless of any negative or positive relationship between the value of a creditor's collateral and the amount of its claim. A result that makes one of five paragraphs redundant should be avoided.

A more narrow reading is also suggested by Congress's addition of § 1206 to the Code in 1986. Pre–BAPCPA section 1206 provided that:

> [a]fter notice and a hearing, *in addition to the authorization contained in section 363(f)*, the trustee in a case under this chapter may sell property under section 363(b) and (c) free and clear of any interest in such property of an entity other than the estate if the property is farmland or farm equipment, except that the proceeds of such sale shall be subject to such interest.

11 U.S.C.A § 1206 (West 2004) (emphasis added). Congress thus intended § 1206 to supplement an estate's rights. 8 COLLIER ON BANKRUPTCY, *supra*, at ¶ 1206.01[2] ("The rights granted to the trustee under § 1206 supplement rather than replace a similar right provided by § 363(f)."). As a result, both § 363(f)(5) and § 1206 apply to sales of estate property in chapter 12.[23]

The interpretive challenge is to construe § 363(f)(5) in a way that complements

---

**22.** A related example might be the ability to sell free and clear of a vendor's right to refuse to deliver except upon full cash payment, but the adequate protection required by § 363(e) for such a sale would likely be the full cash payment itself. *See, e.g., In re Kellstrom Indus., Inc.*, 282 B.R. 787, 794 (Bankr.D.Del. 2002).

Of course, if the interest is such that it may be vindicated only by compelling or restraining some action, it does not qualify under this aspect of § 363(f)(5), and the estate cannot sell free and clear of that interest. *See, e.g., Gouveia v. Tazbir*, 37 F.3d 295 (7th Cir.1994) (landowners whose land bordered on estate's land could not be compelled to accept money damages in lieu of equitable relief for violation of a reciprocal land covenant restricting the neighborhood to single-story, residential property; estate could therefore not sell the property free of the covenant under § 363(f)(5)). *See also In re WBQ P'ship*, 189 B.R. at 106 (finding § 363(f)(5) inapplicable to restrictive covenants without reference to specific state law governing monetary versus equitable satisfaction) (dicta); *In re 523 E. Fifth Street Hous. Pres. Dev. Fund Corp.*, 79 B.R. 568, 576 (Bankr.S.D.N.Y.1987) (court may not sell free and clear of covenant to provide low-income housing).

**23.** Chapter 12 also permits confirmation over the dissent of a secured creditor, 11 U.S.C. § 1225(a)(5), and thus § 1206's existence belies the effort to select cramdown as a type of legal or equitable proceeding to which § 363(b)(5) refers.

§ 1206. In this regard, the first difference between the two provisions is that, unlike § 363(f), § 1206 grants an absolute right to sell free and clear of an interest so long as the interest attaches to the proceeds. This absolute right does not exist in § 363(f)(5), requiring a more narrow interpretation.[24]

Congress added § 1206 in 1986. Its purpose was "to allow family farmers to sell assets not needed for the reorganization prior to confirmation without the consent of the secured creditor subject to the approval of the court." H.R.REP. No. 958, 99th CONG., 2ND SESS. 50 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5246, 5251. Significantly, Congress explicitly made it clear that an interest includes a lien. *Id.* But § 1206 would be unnecessary with respect to liens if § 363(f)(5) already permitted a sale. *See In re Brileya*, 108 B.R. 444, 447 (Bankr.D.Vt.1989) ("Section 1206 modifies § 363(f) so the debtor can sell assets not necessary to the reorganization without the secured creditor's consent.").

We follow this reasoning and hold that the bankruptcy court must make a finding of the existence of such a mechanism and the trustee must demonstrate how satis-

faction of the lien "could be compelled." *In re Terrace Chalet Apts.*, 159 B.R. at 829–30. Here the bankruptcy court should not have explicitly dismissed the argument that any such finding or showing is required.[25]

#### c. Legal or Equitable Proceeding

Paragraph (5) requires that there be, or that there be the possibility of, some proceeding, either at law or at equity, in which the nondebtor could be forced to accept money in satisfaction of its interest.[26] The bankruptcy court reasoned that there was no need to prove the existence or possibility of a qualifying legal or equitable proceeding when the interest at issue was a lien because all liens, by definition, are capable of being satisfied by money.[27]

The language of § 363(f)(5) indicates that compelling a nondebtor to accept a monetary satisfaction cannot be the sole focus of the inquiry under that paragraph. The statute additionally requires that "such entity could be compelled, *in a legal or equitable proceeding*, to accept" such a monetary satisfaction. 11 U.S.C. § 363(f)(5) (emphasis added). The question is thus whether there is an available type or form of legal or equitable proceed-

---

24. A sale under § 363(f) is subject to § 363(e), which also conditions the sale on the provision of adequate protection. "Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attached to the proceeds of the sale." H.R.REP. No. 595, 95th Cong., 1st Sess. 345 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 56 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6301–02, 5787, 5842. With respect to a lien, then, § 1206 provides no more than § 363(f)(5) if the availability of nonconsensual confirmation under § 1225(a)(5) is sufficient as a legal and equitable proceeding to trigger a sale free and clear under § 363(f)(5).

25. The Trustee and DB attempt to resolve this dilemma by asserting that if (f)(5) is found to require full payment of the debt, then (f)(3)

must require full payment of the economic value of the lien—the value of the property—rather than full payment of the debt itself. This interpretation, however, makes (f)(5) superfluous.

26. We assume, but do not decide, that the appositive "in a legal or equitable proceeding" excludes the possibility of an administrative proceeding.

27. The bankruptcy court stated at the hearing, "I don't even think they need to prove their cram-down scenario. I think ... that they could be made to go away if you wrote them a check.... The question is, is it the kind of an interest that could be satisfied with money, and if so, then, you can sell free and clear." Hr'g. Tr. 98:20–99:3 (April 5, 2007).

ing in which a court could compel Clear Channel to release its lien for payment of an amount that was less than full value of Clear Channel's claim. Neither the Trustee nor DB has directed us to any such proceeding under nonbankruptcy law, and the bankruptcy court made no such finding.

■■■ The Trustee points out that courts have found that cramdown under § 1129(b)(2) is a qualifying legal or equitable proceeding.[28] *See, e.g., In re Gulf States Steel*, 285 B.R. at 508; *In re Grand Slam USA, Inc.*, 178 B.R. 460, 462 (E.D.Mich.1995); *In re Healthco*, 174 B.R. at 176; *In re Terrace Chalet Apts.*, 159 B.R. at 829.

We disagree with the reasoning of these courts. As a leading treatise recognizes, use of the cramdown mechanism to allow a sale free and clear under § 363(f)(5) uses circular reasoning—it sanctions the effect of cramdown without requiring any of § 1129(b)'s substantive and procedural protections. 3 COLLIER ON BANKRUPTCY, *supra*, at ¶ 363.06[6]. If the proceeding authorizing the satisfaction was found elsewhere in the Bankruptcy Code, then an estate would not need § 363(f)(5) at all; it could simply use the other Code provision.

In addition, this reasoning undercuts the required showing of a separate proceeding. For example, it is correct that § 1129(b)(2) permits a cramdown of a lien to the value of the collateral, but it does so only in the context of plan confirmation. To isolate and separate the cramdown from the

checks and balances inherent in the plan process undermines the entire confirmation process, and courts have been leery of using § 363(b) to gut plan confirmation or render it superfluous.

We thus hold that Congress did not intend under § 363(f)(5) that nonconsensual confirmation be a type of legal or equitable proceeding to which that paragraph refers. As a result, the availability of cramdown under § 1129(b)(2) is not a legal or equitable proceeding to which § 363(f)(5) is applicable.

In short, for the reasons outlined above, § 363(f)(5) does not apply to the circumstances of this case.

*C. Were Payments Made Pursuant to the "Carve–Out" Free and Clear of Clear Channel's Lien?*

■■■ Clear Channel asserts that the removal of its lien from the Carve–Out Amount was an abuse of discretion both procedurally and substantively. We think this misperceives the nature of the Carve–Out Amount, and we thus affirm on this point.

Implicit in Clear Channel's argument is that the Carve–Out Amount was "sold" and that it constitutes proceeds of the sale of PW's property. The structure of the transaction, however, does not fit Clear Channel's characterization. The governing documents do not provide that the Carve–Out Amount was part of the Strike Price paid by DB, which DB was then obligated to rebate to the Trustee.[29]

---

28. Courts use "cramdown" and "cram down" and "cram-down" interchangeably to refer to nonconsensual confirmation. The hyphenated version appears to have been the first locution used by a court. *New England Coal & Coke Co. v. Rutland R.R. Co.*, 143 F.2d 179, 189 n. 36 (2d Cir.1944).

29. Inasmuch as we construe the Carve–Out Amount as an independent obligation of DB,

and not as a transfer of its property rights in its collateral, this is not a case in which a secured creditor has allowed its collateral to be used by the estate pursuant to agreement, and thus none of the implications of such a practice on the absolute priority rule are raised on this record. *See, e.g., In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513–14 (3d Cir.2005).

Rather, DB's obligation to pay the Carve–Out Amount "to [PW's] estate upon the Sale" was a separate obligation.

The statement of the obligation was physically and logically isolated from DB's obligation to pay the Strike Price. Its source is in a separate part of the Binding Term Sheet, and the ultimate calculation of the amount payable incorporated factors separate from the sale. Thus, while the Sale Order expressly attached Clear Channel's lien to the proceeds of the sale, the Carve–Out Amount was not proceeds. As a result, no procedural or substantive rights of Clear Channel were violated, as Clear Channel cannot claim an interest in DB's nonpurchase obligations to the Trustee.

## IV. CONCLUSION

1. Considerations of equitable mootness and § 363(m) render moot Clear Channel's appeal of the validity of the sale of PW's property to DB. But Clear Channel's appeal of the lien-stripping is not equitably moot because we can fashion effective relief, and it is not statutorily moot because § 363(m) is inapplicable.

2. The bankruptcy court did not apply the correct legal standard under § 363(f)(5), and it therefore did not make the findings required by that paragraph. We therefore reverse that part of the bankruptcy court's order that held that, under § 363(f)(5), the sale was free and clear of Clear Channel's lien.

3. Further, because of the bankruptcy court's incorrect interpretation of the statute, we remand this case for further proceedings consistent with this disposition. This will allow the parties to attempt to identify a qualifying proceeding under non-bankruptcy law (if one exists) that would enable them to strip Clear Channel's lien and make the sale of PW's property to DB free and clear under § 363(f)(5).

4. We affirm the bankruptcy court's holding that Clear Channel's lien did not attach to the Carve–Out payment that DB made to the Trustee.